Receipt number AUSFCC-5940210

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FLIGHTSAFETY SERVICES CORPORATION,

     Plaintiff,

v.

THE UNITED STATES,

     Defendant.

No. **20-95 C**

## COMPLAINT

Plaintiff FlightSafety Services Corporation ("FlightSafety"), through undersigned counsel, files its Complaint against the United States of America (the "Government") to appeal a contracting officer's final decision issued under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101, *et seq.*

## INTRODUCTION

On May 1, 2013, the United States Air Force ("Air Force") awarded FlightSafety Contract No. FA8621-13-C-6247 (the "Contract") under which FlightSafety was to, among other things, design, develop, deliver, and maintain the KC-46 Aircrew Training System ("ATS") for the KC-46 refueling aircraft. Designing a training system for a complex new aircraft requires significant detailed and accurate design data to provide a complete understanding of the underlying aircraft's design and flight characteristics. Here, in order for FlightSafety to perform its scope of work with respect to the design, development, delivery, and maintenance of the ATS related to the underlying KC-46 aircraft, FlightSafety necessarily required data from the Air Force directly, or through the Air Force's KC-46 aircraft Original Equipment Manufacturer ("OEM"). FlightSafety understood and relied upon representations the Air Force made in

response to solicitation questions that the required data would be made readily available to FlightSafety upon award of the Contract.

Consistent with FlightSafety's understanding that the data would timely be made available, FlightSafety's proposal made clear that it was entitled to obtain the design data (i.e., receive it); not create, buy, or otherwise acquire the data. Indeed, FlightSafety included in its proposal the costs for visiting the KC-46 aircraft OEM to obtain the data (for example, travel and other expenses related to personnel visits to gather, duplicate, and/or ship the data to FlightSafety). FlightSafety did not, however, assume the risk that the necessary design data would not be provided. FlightSafety's understanding also is consistent with the plain language of the Contract and the manner in which the Air Force structured the Contract. Under the contract structure selected by the Air Force, the Air Force is the sole party with the contractual right and, therefore, duty to ensure the KC-46 aircraft OEM timely made available the necessary design data.

FlightSafety, throughout its Contract performance, expended reasonable efforts to obtain the data required for development of the KC-46 ATS. The Air Force, however, failed to ensure the timely, complete, and necessary availability of the data FlightSafety needed for its performance. Nevertheless, the Air Force directed FlightSafety to meet all contractual deadlines. The Air Force, as a result of this inaction to ensure the timely availability of the design data, while simultaneously directing FlightSafety meet all contractual deadlines, changed the Contract. FlightSafety proactively notified the Air Force of the performance impacts resulting from delayed and incomplete data, including increased costs to mitigate the effects of missing data and to incorporate late data into in-process training device design and courseware development.

The Air Force has refused, despite its change to the Contract, to provide FlightSafety the equitable adjustment to which FlightSafety is entitled to compensate FlightSafety for this change.  This is a breach of contract.  The Air Force caused FlightSafety to incur substantial delay, disruption and additional costs in performing its work under the Contract.  The Air Force is responsible for this delay and disruption, and for FlightSafety's increased costs, plus a reasonable profit.

## STATEMENT OF THE CASE

For its Complaint, FlightSafety alleges as follows:

### I.    PARTIES

1.      FlightSafety is a Delaware corporation, with its principal place of business located at 10770 East Briarwood Avenue, Suite 100, Centennial, Colorado, 80112.  FlightSafety provides mission-critical training programs and equipment to military and government flight crews.

2.      Defendant is the United States Government, acting by and through the Department of the Air Force, Air Force Life Cycle Management Center - Wright-Patterson Air Force Base (the "Air Force" or "Government").

### II.    JURISDICTION

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a) and the CDA, 41 U.S.C. § 7104.

4.      FlightSafety submitted a claim, dated May 1, 2019 (the "Certified Claim"), to the cognizant Procurement Contracting Officer ("PCO"), pursuant to 41 U.S.C. § 7103(a).

5.      FlightSafety's Certified Claim was certified in accordance with the requirements of 41 U.S.C. § 7103(b).

6.     The Air Force, on July 1, 2019, through the cognizant PCO, Ms. Melissa M. Koppenhoefer, issued a contracting officer's final decision denying FlightSafety's claim in full.

7.     FlightSafety's appeal to this Court is timely because the appeal has been filed within 12 months of the PCO's final decision, as required by 41 U.S.C. § 7104(b)(3).

## III.   FACTS

### A.     Pre-Solicitation Activity for the Contract

8.     The purpose of the Air Force's KC-X program[1] is to procure a next-generation aerial refueling tanker aircraft to replace the Boeing KC-135 Stratotanker aircraft.

9.     On April 25, 2006, the Air Force issued a Request for Information ("RFI") for replacement of the KC-135 Stratotanker.

10.    On January 30, 2007, the Air Force issued a Request for Proposal ("RFP") for procurement of the KC-X next-generation aerial refueling tanker aircraft.

11.    On December 16, 2009, the Air Force issued an RFI, RFI-KC-X (the "KC-X ATS RFI"), to "identify, as potential sources, companies that may possess the expertise, capabilities, and experience to competently and competitively respond to requirements for the design, development, production, integration, installation, and sustainment of the KC-X ATS for use by United States Air Force personnel."

12.    The KC-X ATS RFI stated that "[t]he selected KC-X ATS contractor will be required to enter into an Associate Contractor Agreement with the KC-X tanker aircraft prime contractor in accordance with AFMC FARSUP 5352.217-9010 (Oct. 2008) in order to obtain

---

[1]     The KC-X program was the generic description for what eventually became known as the KC-46 program.  This is further explained below.

data and associated license rights necessary to develop, field, operate, and sustain the KC-X ATS."

13.    The KC-X ATS RFI further stated that:

> [T]he selected KC-X ATS contractor will use preliminary data provided by the KC-X tanker aircraft manufacturer for interim qualification of KC-X ATS simulators.  Final updated data will need to be installed in KC-X ATS simulators within 12 months following availability of final flight data which is projected for release 90 days after completion of both KC-X tanker aircraft Development Test and Evaluation and FAA certification flight testing.

14.    The KC-X ATS RFI specified that the "KC-X ATS solicitation will encapsulate all of the components listed above."

15.    Responses to the KC-X ATS RFI were due by January 22, 2010.

16.    On January 14, 2010, FlightSafety submitted a response to the KC-X ATS RFI.

17.    On November 17, 2010, the Air Force held an industry day for the KC-X ATS.

18.    During the November 17, 2010 industry day question and answer ("Q&A") session, the Industry question and Air Force answer, in Q&A #86, provided:

| Question from Industry: | What expectation does the Government have on the level of fidelity of the training devices?<br><br>Is the Government willing to pay for better technology innovations that enhance the quality of training? |
| --- | --- |
| Government Response: | The government expects the WST [Weapons System Trainer],[2] BOT [Boom Operator Trainer], and FuT [Fuselage Trainer] to all have very high levels of fidelity.  The aircraft OEM [Original Equipment Manufacturer] will deliver an aircraft sim data package, as well as, ARASQ data for all tanker/receiver pairs for incorporation into the devices.<br><br>Acquisition strategy regarding technology innovations has yet to be determined/ approved. |

---

[2]    FlightSafety has added the meaning of acronyms via brackets to the quoted text.

19.  During the November 17, 2010 industry day, Q&A #97 provided:

| Question from Industry: | Will data in the package including mechanical, electrical, avionics, power plant, subcontractor vendors, etc. . . be GFP [Government Furnished Property]? |
|---|---|
| Government Response: | Yes. |

20.  During the November 17, 2010 industry day, Q&A #102 provided:

| Question from Industry: | SOW [Statement of Work] (Para 3.2.2.2) – what specific data will the aircraft prime be required to deliver?<br>a.  Drawings<br>b.  OFPs for aircraft and subsystems<br>c.  Technical manuals<br>d.  Mission planning software and supporting navigational data transfer modules and recurring data updates<br>e.  Technical meeting minutes, design review presentations, etc. . .<br>f.  Aural cue recordings – ECS, engines, gear, etc. . . |
|---|---|
| Government Response: | Data required by IATA [International Air Transport Association] performance data standard required in CDRL [Contract Data Requirements List] B027 of aircraft RFP.  Also the modeling and qualification data required for ARASQ. |

21.  During the November 17, 2010 industry day, Q&A #118 provided:

| Question from Industry: | Is it the expectation of the government that the contractor will be required to engage in ACA's [Associate Contractor Agreement] with other third parties required to support the aircraft data package? |
|---|---|
| Government Response: | It is the government's expectation that the ACA with the Aircraft Prime will suffice for data.  However, license fees to vendors may still be required. |

22.  During the November 17, 2010 industry day, Q&A #119 provided:

| Question from Industry: | Please confirm that the aircraft OEM will be required to supply sufficient data to support CFR [Code of Federal Regulations] Part 60 Level-D simulation and proof of match requirements? |
|---|---|

| Government Response: | Yes, per CDRL B027 and SCR [Special Contract Requirement] H007 of the aircraft RFP. |
|---|---|

23.     During the November 17, 2010 industry day, Q&A #127 provided:

| Question from Industry: | How does the USAF see the requirement for the Aircraft OEM to supply data for the manufacture of the training devices working in practice? |
|---|---|
| Government Response: | Government expects data to be delivered per aircraft contract.  Government expects proactive effort by the ATS contractor will be needed. |

24.     During the November 17, 2010 industry day, Q&A #138 provided:

| Question from Industry: | Aircraft OEM contract – when does ATS contractor get the data? |
|---|---|
| Government Response: | Incrementally per B027 CDRL in aircraft RFP/contract. |

25.     On January 9 and 10, 2011, the Air Force held the KC-X ATS pre-solicitation conference.

26.     During the pre-solicitation conference one-on-one question and answer ("Q&A") session between the Air Force and FlightSafety, the Air Force informed FlightSafety that the data package, after execution of the ACA, would be provided free of charge.

**B.     The Boeing Contract for the Development of the KC-46 Aircraft**

27.     On February 24, 2011, the Air Force awarded to The Boeing Company ("Boeing") the KC-X aircraft development contract, FA8625-11-C-6600 ("Boeing Contract"), to begin replacement of the aging fleet of Air Force refueling tanker aircraft.

28.     With the Boeing Contract award, Boeing became the OEM for the KC-X aircraft.

29.     The winning Boeing design for this aircraft was named the KC-46.  The Boeing design included part of the existing Boeing 767-2C commercial aircraft design, along with new military aircraft design features for air refueling and different cargo requirements.

30.     The Boeing Contract requires that Boeing deliver "all technical data (including computer software documentation) and computer software necessary . . . to develop the KC-X Aircrew Training System (ATS)."  Boeing Contract, SCR H007(b).

31.     The Boeing Contract also requires that Boeing:

> [P]rovide the technical data and computer software having the characteristics (e.g., content, format, and delivery medium) necessary for . . . ATS . . . development, as determined and required by the Government.  The Government will require that such technical data or computer software include - (A) [n]o less information or detail than industry standards, nor less than the contractor typically requires, to perform such . . . training activities; and (B) [a]dditional information or detail that is necessary for military purposes related to . . . training systems.

Boeing Contract, SCR H007(b)(1).

32.     The Boeing Contract further requires that Boeing "provide a complete package of all technical data and computer software necessary for the Government to . . . develop the ATS . . . for all KC-X systems, subsystems, and components, and upgrade other weapon systems simulators to train refueling from the KC-X, without exception."   Boeing Contract, SCR H007(b)(3).

33.     This "complete package" was to include:

> [A]ll OMIT [Operations, Maintenance, Installation, and Training] Data (Exhibit B to the [Boeing] Contract) and associated license rights that are necessary for the Government to develop the Type 1 training and the ATS/MTS [Maintenance Training System], in accordance with SCR H007, to include the OMIT Data and license rights for a subset of OMIT Data that is necessary to upgrade other weapon system simulators to train refueling from the KC-X Aircraft.

Boeing Contract § J, Attach. 2 § 1.4.2.1.e.

34.     This data is referred to as the "simulator data package" and is encompassed in Contract Line Item Number ("CLIN") 0005 (CDRL No. B027) of the Boeing Contract.

35.     CDRL B027 of the Boeing Contract requires Boeing to deliver to the Air Force a complete simulator data package in conformance with the IATA Flight Simulator Design and Performance Data Requirements.

36.     The Boeing Contract Statement of Work ("SOW") also states that Boeing "shall provide support for the development of the ATS" and "shall support design reviews, provide answers to aircraft system data that is provided as part of the simulator data package, and support the testing phase of the training devices."  Boeing Contract § J, Attach. 2 § 1.4.2.1.c.

37.     CDRL B027 required Boeing to:

> [S]ubmit the simulator data package IAW [in accordance with] International Air Transport Association-Flight Simulator Design and Performance Data Requirements (Edition 7, 2000), and aerial refueling flight test and flowfield data sufficient to permit modeling and validation of the KC-X as both refueler and receiver that will allow qualification IAW Aerial Refueling Airplane Simulator Qualification (ARASQ), and use as a guide any additional data, beyond the IATA data requirements standard, identified in the International Standards for the Qualification of Airplane Flight Simulators Volumes I and II.  The data package shall include data necessary for modeling, checkout, and validation of an Aerial Refueling Operations (ARO) training simulator to meet qualifications IAW ARASQ standards. The data for the Flight and ARO simulators shall be segregated in the data package.

38.     CDRL B027(a) required delivery to the Air Force of a "draft simulator data package with modeling, check-out and applicable commercial baseline aircraft flight test and the KC-X estimated validation 60 days after PDR [Preliminary Design Review]" (the "Commercial Data Package").

39.     The draft Commercial Data Package was to be finalized 30 days after Government approval.

40.     CDRL B027(b) required delivery to the Air Force of data for the "KC-X military modification" 90 days after Critical Design Review ("CDR") (the "Military Data Package").

41.     CDRL B027(c) required delivery to the Air Force of:

> [D]raft data resulting from development test and evaluation (DT&E) effort 90 days after completion of the DT&E or FAA certification flight test of the aircraft, which testing is later, to include ARASQ/flowfield data for any receiver instrumented to collect such data behind the KC-X during DT&E.   Final due 30 days after Government approval.

42.     CDRL B027(d) required delivery to the Air Force of the "draft to the simulator data package . . . 60 days after PCA.  Final due 30 days after Government approval."

43.     CDRL B027(e) required delivery to the Air Force of the "[d]raft ARASQ/flowfield data gathered during the certification of additional receivers 90 days after the completion of the additional certification of receivers.  Final due 30 days after Government approval."

44.     The Boeing Contract further required Boeing to "develop and enter into Associate Contractor Agreements with Government-selected training systems contractors."  Boeing Contract § J, Attach. 2 § 1.4.2.1.b.

45.     The Boeing Contract incorporated AFMC FARSUP 5352.217-9010, Associate Contractor Agreements (ACAS) (AFMC) (Oct. 2008), which provides, in part, that "[t]he Contractor shall enter into Associate Contractor Agreements (ACA) for any portion of the contract requiring joint participation in the accomplishment of the Government's requirement."

46.     Boeing's timely and complete delivery of the KC-46 technical data and computer software required by the Boeing Contract was essential to FlightSafety's successful design of the ATS.

C.   **The Proposal Process for the ATS Contract**

47.   On November 17, 2011, the Air Force released a draft system specification, draft statement of work, and draft CDRLs for the ATS development contract, requesting recommendations or other feedback.  Comments were due by December 9, 2011.

48.   The November 17, 2011 draft SOW provided, in paragraph 3.2.2.2, design criteria:

> The contractor shall obtain all design criteria necessary to comply with the requirements of the contract.  The contractor shall enter into contractual agreements with other contractors, as necessary, to obtain all data required.  Design criteria shall be the entire body of data which describes all aspects of the training system design. Design criteria includes aircraft data associated with modifications. It shall consist of, but is not limited to, the following types of data and information: technical reports, test reports, technical manuals (TM), engineering drawings, schematics, wiring diagrams, memoranda of telephone conversations and meeting minutes.

49.   On December 19, 2011, the Air Force issued a draft solicitation for the ATS development contract (the "Draft Solicitation").

50.   The Draft Solicitation, in the draft SOW provided, in paragraph 3.2.2.2, design criteria:

> The contractor shall obtain all design criteria necessary to comply with the requirements of the contract. The contractor shall enter into contractual agreements with other contractors, as necessary, to obtain all data required.  Design criteria shall be the entire body of data which describes all aspects of the training system design. Design criteria includes aircraft data associated with modifications. It shall consist of, but is not limited to, the following types of data and information: technical reports, test reports, technical manuals (TM), engineering drawings, schematics, wiring diagrams, memoranda of telephone conversations and meeting minutes.

51.   On December 21, 2011, the Air Force issued responses to potential offerors' comments on the draft system specification, draft statement of work, and draft CDRLs.

52.     The Air Force, in its December 21, 2011 responses, informed offerors that:

**S Q26:**  Will the Government provide the initial data package or will this be part of the ACA with the OEM?  Please clarify.

**Government Response:**  *Boeing will deliver the initial data package to the Government.  The ATS contractor cannot have the data until after executing the ACA with Boeing.*

53.     On February 2, 2012, the Air Force issued additional responses on the Draft Solicitation.

54.     The February 2, 2012 Air Force responses included, among others, the following responses:

**S Q41:**  SOW Paragraph 3.2.2.2.  The requirement is as follows: "The Contractor shall obtain all design criteria necessary to comply with the requirements of the contract."  This implies that the Contractor has been responsible for obtaining the aircraft data. This could mean that the Contractor has to purchase the data from the OEMs.  It could also mean that the Contractor simply has to request the data from the Government and they will provide it as part of the aircraft contract. Can the Government clarify the requirement?

**Government Response:**  *Boeing provides data to the Government via an integrated digital environment (IDE) versus traditional mailed copies to CDRL addressees.  In accordance with the terms of the Government's License for Operations, Maintenance, Installation, and Training (OMIT) data, the Government is authorized to disclose to the Simulator Manufacturers Boeing's Licensed Materials after the Simulator Manufacturer executes an agreement similar to that set forth in the Appendix 1 Sublicense. In lieu of a physical transfer of License materials to the Simulator Manufacturer by the Government, the Sublicense makes provision for the Simulator Manufacturer to obtain Licensed Materials and Commercial Proprietary Information via electronic access to Boeing systems after the Simulator Manufacturer executes an Electronic Access Agreement directly between themselves and Boeing.*

. . .

**S Q62:**  Regarding SOW 3.2.2.2, the KC-46 Aircraft contract has a CDRL to deliver a Simulation Data Package.  Once the ATS

contract is awarded, will the Government consider adding the ATS Contractor to the KC-46 aircraft manufacture's [sic] CDRL distribution list for the applicable CDRLs (e.g., B027)?

**Government Response:**   *The Government will add the ATS Contractor to the aircraft OEM CDRL distribution list only if the aircraft contract T&Cs allows this as a no-cost mod to the aircraft contract.*

. . .

**S Q74:**  Reference SQ-26:  Will the Government provide the initial data package or will this be part of the ACA with OEM? Government Response:   Boeing will deliver the initial data package to the Government.  The ATS Contractor cannot have the data until after executing the ACA with Boeing.  Question:  Will the data package be delivered from Boeing or the Government free of charge?

**Government Response:**  *The Government does not have the right under the License to disclose licensed materials to offerors, only to Simulator Manufacturers as defined in the License.  If the initial deliverables under B027 (Simulator Data Package) are delivered before award of the KC-46 ATS contract, they cannot be transferred until award of the KC-46 ATS contract. Boeing's support to Associate Contractors for other data is required by prime contract clause AFMCFARS 5352.217-9010: Associate Contractor Agreements.  The Simulator Data Package has been provided at no cost to the KC-46 ATS prime Contractor.  However, potential vendors should be cognizant that it may be necessary for them to obtain information directly from aircraft subcontractors if proprietary data rights issues prevent Boeing from including such data.*

55.    On April 9, 2012, the Air Force issued the following updated response to its

February 2, 2012 responses:

**S Q41:**  SOW Paragraph 3.2.2.2.  The requirement is as follows: "The Contractor shall obtain all design criteria necessary to comply with the requirements of the contract."  This implies that the Contractor has been responsible for obtaining the aircraft data. This could mean that the Contractor has to purchase the data from the OEMs.  It could also mean that the Contractor simply has to request the data from the Government and they will provide it as part of the aircraft contract.  Can the Government clarify the requirement?

**Government Response:** *The contractor shall obtain all design criteria necessary to comply with the requirements of the contract. The contractor shall enter into contractual agreements with other contractors, as necessary, to obtain all data required. The contractor shall execute a sublicense agreement with the Government for the use and protection of aircraft design data. Instructions regarding the KC-46 ATS sublicense agreement are contained in SCR H-001 which has been added to the KC-46 ATS model contract.*

*After award of the KC-46 ATS contract, the ATS contractor shall provide its proposed sublicense agreement to the Government for review and approval. Once approved, the sublicense agreement shall be include [sic] in the ATS contract as a Section J attachment.*

*The KC-46 ATS SOW (paragraph 3.2.2.2 Design Criteria) and the IMP have been updated to reflect the sublicense agreement language.*

56.    On April 20, 2012, the Air Force issued the final solicitation, Solicitation No. FA8621-11-R-6251 (the "Solicitation").

57.    The Solicitation in the SOW provided, in paragraph 3.2.2.2, design criteria:

The contractor shall obtain all design criteria necessary to comply with the requirements of the contract. The contractor shall enter into contractual agreements with other contractors, as necessary, to obtain all data required. The contractor shall execute a sublicense agreement with the Government for the use and protection of aircraft design data IAW SCR H-001. Design criteria shall be the entire body of data which describes all aspects of the training system design. Design criteria includes aircraft data associated with modifications. It shall consist of, but is not limited to, the following types of data and information: technical reports, test reports, technical manuals (TM), engineering drawings, schematics, wiring diagrams, memoranda of telephone conversations and meeting minutes.

58.    The Solicitation, in comparison to the Draft Solicitation, changed paragraph 3.2.2.2 of the SOW only by adding the sentence that "[t]he contractor shall execute a sublicense agreement with the Government for the use and protection of aircraft design data IAW SCR H-001."

59.     The Solicitation identified that the Contractor "shall enter into Associate Contractor Agreements (ACA) for any portion of the contract requiring joint participation in the accomplishment of the Government's requirement" and identified that an ACA was "required" with "The Boeing Company."  Solicitation, SCR H006.

60.     On May 29, 2012, FlightSafety submitted its initial proposal to the Solicitation.

61.     On December 12, 2012, FlightSafety submitted its final proposal to the Solicitation (the "Proposal").

62.     At the time of Proposal submission, FlightSafety's understanding was that a March 2012 aircraft PDR with Boeing was held, from which the Commercial Data Package would have been available as of July 2012 (i.e., would be available to be provided to FlightSafety at Contract award).  The aircraft CDR with Boeing was scheduled to be conducted in July 2013, from which the Military Data Package would be provided in October 2013.

63.     FlightSafety based its Proposal on the availability of the Commercial Data Package and Military Data Package in accordance with the timing specified in CDRL B027— receipt of the Commercial Data Package by the Government in July 2012 (to be provided to FlightSafety immediately after award) and the Military Data Package in October 2013.

64.     FlightSafety relied on the timely availability of the Boeing Commercial Data Package and Military Data Package for design and development of FlightSafety's training devices in its Integrated Master Plan ("IMP").

65.     FlightSafety also relied on the timely availability of the Boeing Commercial Data Package and Military Data Package in its Technical Proposal.

66.     Section 5.1.4.2, Aircraft Boom/Drogue/Receiver Bow-Wave Flowfield Characteristics, of FlightSafety's Technical Proposal Risk Narratives stated that "data will be

available from Boeing as part of the KC-46A Military Simulator Data Package delivered to the ATS via aircraft CDRL B027's post aircraft CDR submittal."

67.    FlightSafety's Technical Proposal further included the following data flow diagram identifying the Commercial Data Package delivery in July 2012 and the Military Data Package delivery in October 2013:



Figure 1.4-1, Data Flow Diagram.

68.    FlightSafety's Proposal budgeted costs to cover travel and personnel visits to Boeing facilities necessary to support identifying any discrepancies between the data provided and the complete simulator data package required by the Boeing Contract under CDRL B027, as well as costs to place someone at Boeing to gather, duplicate, and ship (i.e., obtain) data required to support ATS development.

D.       **The Contract**

69.       On May 1, 2013, FlightSafety was competitively awarded the Contract to design, develop, deliver and maintain KC-46 training devices, create courseware, and provide student instruction.

70.       The Contract is a fixed-price incentive (firm target) contract, with firm, fixed-price options, to support the KC-46 aircraft program by furnishing an integrated contractor operated and supported aircrew training system that provides total KC-46 aircrew training.

71.       The fixed-price incentive (firm target) portion of the Contract primarily is for the initial Engineering and Manufacturing Development ("EMD") phase of ATS development.

72.       The Contract provided that options could be exercised in accordance with SCR H-018, Options.

73.       The EMD phase of the Contract is performed in three sequential increments.

74.       Increment 1 consists of the initial device development (i.e., WST 1, WST 2, BOT 1, BOT 2, FuT 1, Pilot Part Task Trainer ("P-PTT") 1, P-PTT 2, and Boom Operator Part Task Trainer ("BO-PTT")), a System Integration Laboratory ("SIL"), a set of airfield models, visual and aerial refueling and aerodynamic flight models, and associated courseware to support conduct of a Small Group Tryout ("SGTO") prior to declaration of the Altus and McConnell sites as Ready-for-Training ("RFT").

75.       Increment 2 consists of a 15-month effort to upgrade any previously delivered device to 14 C.F.R. Part 60 Level D following receipt of the draft data package from the aircraft development test and evaluation ("DT&E") Phases 1 and 2, or receipt of the draft simulator data package from the final aircraft Physical Configuration Audit ("PCA"), whichever occurs later. Increment 2 also includes implementation of Distributed Mission Operations ("DMO")

capability in each Main Operating Base ("MOB") delivered WST and BOT within six months after completion of the Level D effort.

76.     Increment 3 consists of upgrades (within 18 months following draft simulator data package from Phase III aircraft testing) to previously delivered WSTs and BOTs to ARASQ Level D with receipt of additional flight test data from additional receiver certifications.  It also includes additional airfield models and aerial refueling visual models for additional aircraft receiver types.

77.     Each incremental delivery increases the fidelity and capability of the devices, such that they eventually meet the highest fidelity training device requirements based on the then current Government provided guidance and directives.

78.     The completion of Increment 1 requires both the Commercial Data Package and the Military Data Package.

79.     The Contract's SOW at 3.3.3.1, for example, requires Increment 1 include, as a minimum:

>  a)      Two (2) WSTs capable of tanker and receiver aerial refueling training and local network mode connection with a BOT, and based on a data package using empirical, commercial baseline and/or predicted aircraft performance . . . .

>  b)      Two (2) BOTs capable of aerial refueling training and local network mode connection with a WST, and based on a data package using empirical, commercial baseline and/or predicted aircraft performance . . . .

80.     The original RFT date for Increment 1 ATS devices at Altus AFB was February 29, 2016.  This RFT date resulted in a corresponding 1,035 calendar day period of performance.

81.     The Contract's SOW, Paragraph 3.2.2.2, provides:

> The contractor shall obtain all design criteria necessary to comply with the requirements of the contract.  The contractor shall enter into contractual agreements with other contractors, as necessary, to obtain all data required.  The contractor shall execute a sublicense agreement with the Government for the use and protection of aircraft design data IAW SCR H-001.  Design criteria shall be the entire body of data which describes all aspects of the training system design.  Design criteria includes aircraft data associated with modifications.  It shall consist of, but is not limited to, the following types of data and information: technical reports, test reports, technical manuals (TM), engineering drawings, schematics, wiring diagrams, memoranda of telephone conversations and meeting minutes.

82.     The Commercial Data Package and the Military Data Package were the needed data under Paragraph 3.2.2.2 of the Contract's SOW.

83.     Timely delivery or availability of the Commercial Data Package and the Military Data Package was crucial for successful performance of the Contract.

84.     The Contract provides that "[t]he rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein."

85.     The Contract incorporated FlightSafety's IMP.

86.     The IMP identified FlightSafety's reliance on receipt of Boeing's Commercial Data Package and Military Data Package within the timeframe specified in CDRL B027 of Boeing's Contract.

87.     The IMP further identified that, "[f]or the KC-46 Program, FlightSafety will obtain Aircraft Design Criteria Data directly from the aircraft OEMs (OEM), principally Boeing, via Associate Contractor Agreements."

88.     The Contract contains SCR H-006, Associate Contractor Agreements (ACAS) (Oct. 2011), which states:

(a)     The Contractor shall enter into Associate Contractor Agreements (ACA) for any portion of the contract requiring joint participation in the accomplishment of the Government's requirement.  The agreements shall include the basis for sharing information, data, technical knowledge, expertise, and/or resources essential to the integration of the KC-46A Aircrew Training System (ATS) which shall ensure the greatest degree of cooperation for the development of the program to meet the terms of the contract.  Associate Contractors are listed in (g) below.

(b)     ACAs shall include the following general information:

(1)     Identify the associate contractors and their relationships.

(2)     Identify the program involved and the relevant Government contracts of the associate contractors.

(3)     Describe the associate contractor interfaces by general subject matter.

(4)     Specify the categories of information to be exchanged or support to be provided.

(5)     Include the expiration date (or event) of the ACA.

(6)     Identify potential conflicts between relevant Government contracts and the ACA; include agreements on protection of proprietary data and restrictions on employees.

(c)     A copy of such agreement shall be provided to the Contracting Officer for review before execution of the document by the cooperating contractors.

(d)     Nothing in the foregoing shall affect compliance with the requirements of the clause at 5352.209-9002, Organizational Conflict of Interest.

(e)     Liability for the improper disclosure of any proprietary data contained in or referenced by any agreement shall rest with the parties to the agreement, and not the Government.

(f)     All costs associated with the agreements are included in the negotiated cost of this contract. Agreements may be amended as required by the Government during the performance of this contract.

(g)     The following contractors are associate contractors with whom agreements are required:

>   (1)     THE BOEING COMPANY
>           7755 E MARGINAL WAY S
>           SEATTLE WA 98108-4002
>           CONTRACT #FA8625-11-C-6600
>
>   (2)     NORTHROP GRUMMAN SPACE & MISSION
>           SYSTEMS (MAF DMO 0&1)
>           1762 GLENN CURTISS ST
>           CARSON CA 90746-4034
>           CONTRACT #F33657-98-D-2061 DELIVERY
>           ORDER 0142
>
>   (3)     NORTHROP GRUMMAN INFORMATION
>           TECHNOLOGY (GTIMS)
>           7575 COLSHIRE DRIVE
>           McLEAN VA 22102-7508
>           CONTRACT #HC1 028-08-D-2023 DELIVERY
>           ORDER 0045
>
>   (4)     KC-46 MTS Contractor: TBD

89.     The Contract also required FlightSafety to enter into a Sublicense Agreement with the Government for the use and protection of Boeing's simulator data packages.

90.     The Contract, at SCR H-001, Sublicense Agreement (Apr. 2012), specifically states that "[i]n accordance with the KC-46 ATS Statement of Work (SOW) Paragraph 3.2.2.2, the contractor is required to enter into a Sublicense agreement with the Government for the use and protection of data from the KC-46 aircraft contractor."

91.     The Contract SOW specifies that ATS design data shall be provided prior to the "design criteria freeze date" which was to be "established at the applicable Government approved [CDR]." In other words, FlightSafety was required to incorporate "all data available as

of the applicable design criteria freeze date" (i.e., the ATS CDR), which was set for November 2013.

92.     The Contract incorporates by reference Federal Acquisition Regulation ("FAR") 52.243-1, Changes -- Fixed-Price (Aug. 1987) and FAR 52.243-1 Changes -- Fixed-Price (Aug. 1987) - Alternate II (Apr. 1984).

93.     FAR 52.243-1, Changes -- Fixed-Price (Aug. 1987),  provides, in part, that:

> The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
>
> (1)     Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications.
>
> (2)     Method of shipment or packing.
>
> (3)     Place of delivery.

94.     FAR 52.243-1, Changes -- Fixed-Price (Aug. 1987) - Alternate II (Apr. 1984), provides, in part, that:

> The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
>
> (1)     Description of services to be performed.
>
> (2)     Time of performance (*i.e.,* hours of the day, days of the week, etc.).
>
> (3)     Place of performance of the services.
>
> (4)     Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government, in accordance with the drawings, designs, or specifications.
>
> (5)     Method of shipment or packing of supplies.
>
> (6)     Place of delivery.

95.     Both FAR 52.243-1, Changes -- Fixed-Price (Aug. 1987) and FAR 52.243-1

Changes -- Fixed-Price (Aug. 1987) - Alternate II (Apr. 1984) provide, in part, that:

> If any such change causes an increase or decrease in the cost of, or
> the time required for, performance of any part of the work under
> this contract, whether or not changed by the order, the Contracting
> Officer shall make an equitable adjustment in the contract price,
> the delivery schedule, or both, and shall modify the contract.

**E.    Contract Performance**

96.     On May 1, 2013, the award date of the Contract, Boeing had not produced or

delivered a KC-46 Tanker aircraft, meaning only preliminary and engineering design criteria

data were available.

97.     While the PDR, under the Boeing Contract, which was scheduled for March 2012

was completed on April 27, 2012, the Commercial Data Package was not made available to

FlightSafety at Contract award.

98.     In May 2013, FlightSafety and the Air Force held the contractually required Post

Award Conference ("PAC") Requirements Review.

99.     In accordance with the SOW, FlightSafety provided the Air Force with the

Integrated Master Schedule ("IMS") at the PAC.

100.    FlightSafety's IMS and the related slides provided to the Air Force at the PAC

communicated, based on the award of the Contract at a date later than originally anticipated, a

need-by date in order for FlightSafety to meet contractual deadlines of June 14, 2013, for the

initial Commercial Data Package and October 1, 2013, for the Military Data Package.

101.    The Commercial Data Package would provide data for the start of general aircraft

flight components based on the 767-2C aircraft and was to be the basis for ATS design and up to

90% of critical design.

102.    The Military Data Package would provide data for KC-46 aircraft flight performance data, "as delivered" KC-46 configuration data, initial refueling modeling, threat warning system, and other components specific to military aircraft based on empirical and predictive KC-46 aircraft performance data.

103.    On or before June 14, 2013, FlightSafety did not receive the complete Commercial Data Package.

104.    On July 9, 2013, FlightSafety signed a Sublicense Agreement with the Air Force PCO, as required by the Contract, which granted a worldwide, nonexclusive personal and nontransferable sublicense to use "Commercial Proprietary Materials provided directly or indirectly from the Aircraft Contractor that are licensed for use under the [Boeing Contract]."

105.    The Sublicense Agreement states that the "USAF has been delivered certain data and proprietary materials from the Aircraft Contractor which is necessary for engineering manufacturing development of the [ATS]."

106.    The Commercial Data Package still was neither available nor provided to FlightSafety in July 2013.

107.    On July 26, 2013, FlightSafety provided written notification to the Air Force PCO, Mr. Kurt Ettrich, that FlightSafety was experiencing cost and schedule impacts to the Contract, and that those impacts were the result of the Air Force's inability to timely deliver the necessary Commercial Data Package.

108.    On August 15, 2013, FlightSafety executed a Nondisclosure Agreement for the Air Force to provide FlightSafety with Boeing data, including the Commercial Data Package.

109.    On August 20, 2013, more than two months after the need date set forth in FlightSafety's proposal and baseline IMS, FlightSafety received the initial Commercial Data Package from the Air Force, delivered by U.S. Mail.

110.    The Commercial Data Package FlightSafety received on August 20, 2013, was not compliant with Boeing's requirements under the Boeing Contract, including CDRL B027.

111.    The Commercial Data Package FlightSafety received on August 20, 2013, was not compliant with IATA Flight Simulator Design and Performance Data Requirements (Edition 7, 2000).

112.    When the initial Commercial Data Package was first provided, it was supposed to contain Boeing 767-2C data.

113.    The Commercial Data Package FlightSafety received on August 20, 2013, contained only partial design criteria data that was for the Engineering Simulator ("eCAB") used at the Boeing training center near Seattle, Washington, rather than the actual aircraft.

114.    The Commercial Data Package FlightSafety received on August 20, 2013, included design details relating to a 767-200 engine and aerodynamics, not the necessary 767-2C package on which the KC-46 aircraft was based.

115.    On August, 21, 2013, Boeing and the Air Force held the Boeing Contract CDR, previously scheduled for July 2013.

116.    On September 5, 2013, FlightSafety notified the Air Force that the Commercial Data Package was incomplete.

117.    In its September 5, 2013 letter, FlightSafety also notified the Air Force that, as a result of the unavailability of the required commercial data package, FlightSafety was on a "day-for-day schedule slip and will incur possible additional cost and schedule impacts."

118.    On September 6, 2013, FlightSafety delivered a detailed letter to the Air Force PCO identifying deficiencies in the data package delivered on August 20, 2013.

119.    Based on information and belief, the Air Force rejected the August 20, 2013 Commercial Data Package from Boeing as not compliant with the requirements of the Boeing Contract.

120.    On September 9, 2013, the Air Force PCO issued a letter to FlightSafety that acknowledged receipt of FlightSafety's notice of cost and schedule impacts resulting from the lack of required aircraft data needed for design of the ATS devices.

121.    The September 9, 2013 Air Force letter also identified issues based on Boeing's "reticence" to establish an ACA with FlightSafety and stated that "[t]he KC-46 ATS Program Office has contacted the KC-46 Aircraft Program Office regarding this issue and they are talking with Boeing about working directly with FlightSafety."

122.    On September 16, 2013, FlightSafety received a Commercial Data Package updating the August 20, 2013 Commercial Data Package, which included two additional Boeing 767 derivative aircrafts, the 767-300ER and 767-400F freighter.

123.    The Commercial Data Package FlightSafety received on September 16, 2013, was not compliant with Boeing's requirements under the Boeing Contract, including CDRL B027.

124.    Based on information and belief, the Air Force rejected the September 16, 2013 Commercial Data Package from Boeing as not compliant with the requirements of the Boeing Contract.

125.    On September 30, 2013, FlightSafety formally notified the Air Force PCO that "Boeing has been reticent to agree to an ACA with FlightSafety in a timely manner because they claim that their Aircraft contract does not require they do so."

126.    On September 30, 2013, FlightSafety also notified the Air Force PCO that the "cost impacts associated with delay data will be assessed by FlightSafety once the complete data package has been received and accepted by FlightSafety."

127.    On or before October 1, 2013, FlightSafety did not receive a complete Military Data Package.

128.    On October 9, 2013, FlightSafety received from the Air Force an incomplete Military Data Package.

129.    The Military Data Package FlightSafety received on October 9, 2013 was not compliant with Boeing's requirements under the Boeing Contract, including CDRL B027.

130.    FlightSafety anticipated receiving a Military Data Package that included CDRL B027 data deliverables needed to begin the basic KC-46 simulation model, as well as updated aircraft flight performance data for the 767-2C configuration and predictive KC-46 data stemming from the aircraft CDR.

131.    The predictive KC-46 data stemming from the aircraft CDR was vital for the completion of Increment 1 because actual KC-46 flight data would not be available until Increment 2.

132.    Based on information and belief, the Air Force rejected the October 9, 2013 Military Data Package from Boeing as not compliant with the requirements of the Boeing Contract.

133.    On October 15, 2013, FlightSafety, during a weekly program status call, informed the Air Force that delays in delivery, shortages, or changes in aircraft data impact the Contract schedule and were a program risk.  FlightSafety also informed the Air Force that without the

complete Commercial Data Package and Military Data Package, ATS CDR would not be achievable.

134.    On October 29, 2013, FlightSafety and Boeing executed the ACA.

135.    On October 31, 2013, FlightSafety sent a letter to the Air Force PCO informing the Air Force that "FlightSafety has reviewed the additional Boeing Data that the Government has provided and has compiled a list of data that is still missing."  The letter attached a 16-page list of missing data.

136.    On November 19, 2013, FlightSafety met with Boeing to discuss the data delivery requirements in Boeing's Contract and to inquire when FlightSafety could anticipate receiving the Commercial Data Package and Military Data Package as required by CDRL B027 and SCR H007 of the Boeing Contract.

137.    On November 22, 2013, during the first Program Management Review ("PMR") briefing, FlightSafety briefed the Air Force, using Boeing slides, on Boeing's interpretation that it need not provide all the data FlightSafety required directly to FlightSafety.

138.    On December 3, 2013, FlightSafety sent the Air Force PCO a letter informing the Air Force that "FlightSafety has examined the Government-provided data (Boeing CDRL B027 Deliveries a & b) and found that key elements required for development of the KC-46 [ATS] are not included therein."

139.    This December 3, 2013 letter informed the Air Force that:

> As a result of a [sic] Boeing's briefing on 19 November 2013, it is our understanding that the data necessary for development of the ATS will be delivered to the Government under Boeing's CDRLs B002, B004, B023, B030, B036, and B037 and others; however, these deliveries are not scheduled to occur until 2016 and 2017.  It also is our understanding that Boeing has a large percentage of this data prepared, but it will not be packaged for provisioning outside of the company until the time of required delivery to the

Government.  This lack of availability of required data is creating an impossibility of performance under the ATS contract.

140.    FlightSafety, in the December 3, 2013 letter, continued to identify that "cost and schedule have been and will continue to be impacted, as we have previously communicated to the government."

141.    FlightSafety, in the December 3, 2013 letter, further requested:  "(i) that all parties to both contracts convene and resolve the unavailability of data and determine an appropriate solution; and (ii) that the [Contract] be adjusted commensurately."

142.    As a result of FlightSafety's December 3, 2013 letter, FlightSafety, the Air Force, and Boeing developed a formal Data Information Request ("DIR") process.

143.    Under the agreed DIR process, FlightSafety would make requests for data that were still needed for the ATS design which, after approval by the Government, would be submitted to Boeing, who was then supposed to deliver the data to both the Government and FlightSafety simultaneously.

144.    The entirety of the data FlightSafety requested throughout the DIR process was data that should have been delivered to the Government under CDRL B027 of the Boeing Contract.

145.    Even after implementation of the DIR process, however, many of FlightSafety's DIRs were either only partially filled or denied.

146.    When a DIR was only partially filled or denied, the Government still directed FlightSafety to close the DIR.

147.    FlightSafety briefed the Air Force on the status of DIRs, including those that were denied and/or only partially filled.

148.    FlightSafety submitted 693 DIRs through the end of 2017, of which 147 were initially rejected or partially filled.

149.    On May 5, 2014, FlightSafety again informed the Air Force PCO of schedule impacts based on the lack of data from Boeing even though FlightSafety had an ACA, a Nondisclosure Agreement, and a Sublicense Agreement.

150.    On February 3, 2015, FlightSafety informed the Air Force of the need to change the courseware media mix, transitioning from Computer-based Training ("CBT") lessons to Instructor-based Training ("IBT") lessons, due to the ongoing lack of Boeing data.

151.    On August 19, 2015, despite the ATS devices operational baselines not yet having been completely developed in the ongoing EMD phase as a result of insufficient data, the Air Force exercised Production Option 1 for additional device production.

152.    The exercising of Production Option 1 when the ATS device's operational baselines were not completely developed requires a significant amount of overlap between continuing EMD efforts and Production Option manufacturing and deployment.

153.    As a result of the incomplete and incorrect data being provided, FlightSafety had to use the limited data provided to create preliminary design details for KC-46 aircraft systems simulations.  This preliminary design had to be re-worked as updated data was received.

154.    In order to meet contractual obligations, FlightSafety also had to use sophisticated and costly alternative data development methods to compensate for missing aircraft OEM design criteria and produce an acceptable solution.

155.    During the course of the Contract, the Air Force actively directed and encouraged FlightSafety to develop work-arounds due to the lack of data and FlightSafety proactively communicated with the Air Force through PMRs, weekly program status meetings, weekly

Schedule Working Group teleconferences, emails, and monthly IMS analyses such recommended work-arounds.

156.    On November 3, 2015, FlightSafety and the Air Force met to discuss a way forward in light of the continued data delays.

157.    It was decided at this November 3, 2015 meeting, and later approved by the PCO, for FlightSafety to concentrate on a set of Maneuver Item File ("MIF") items most crucial to conducting a viable first phase of SGTO.

158.    Specifically, due to the late and missing data issues, it was determined on November 3, 2015, that FlightSafety should deliver devices for SGTO Phase 1 that were only capable of fulfilling "Red Items" capabilities.

159.    A "Red Item" was defined as a "[m]inimum training simulation requirement (including critical items that can't be trained on the aircraft)."

160.    Additionally, due to the delays and incompleteness of the aircraft OEM data, as well as numerous delays to the aircraft development program, three ATS CDRs occurred (i.e., September 22, 2014, June 18, 2015, and June 20, 2016), which resulted in the design freeze date being repeatedly delayed.

161.    FlightSafety insisted on setting a data freeze date of December 1, 2015, for all devices in order to meet the contractual RFT dates.  The Air Force did not adhere to the data freeze dates and FlightSafety's resulting performance, including related to preparing coursework, has continually been impacted by ongoing issues with data delivery delays and incompleteness of aircraft OEM data.

162.    On June 30, 2016, the Air Force redefined the contractual SGTO approach into three distinct phases, each of which would be enacted depending on the dates for Altus site RFT and/or the aircraft availability date provided by the Air Force.

163.    This split SGTO into phases and resulted in, instead of a single phase of EMD Increment 1 development, multiple phases and a different sequence in which EMD work would be completed.  This also has prompted FlightSafety to implement a year of quarterly updates to all training device software baselines.

164.    On July 12, 2016, FlightSafety informed the Air Force, via a letter, that:

> As we discussed during the Referenced PMR, there have been multiple situations where FlightSafety has been denied receipt of Boeing data that has already been delivered to the Government because Boeing included a proprietary information statement precluding distribution to FlightSafety.  We also understand that Boeing is mismarking Operations, Maintenance, Installation, and Training (OMIT) data as non-OMIT data.  This circumstance introduces additional roadblocks to the already tenuous data situation resulting in additional unnecessary effort and costs and potential schedule impacts.

> The section H clause, H007 Delivery and License Rights for Technical Data and Computer Software Necessary for Depot-Level Maintenance and Training Systems, in the Boeing aircraft contract FA8625-11-C-6600, contains the following requirement:

> "3. Training Systems Technical Data and Computer Software.  The technical data (including computer software documentation) and computer software delivered under CLINs 0006 and 0005 must provide a complete package of all technical data and computer software necessary for the Government to develop Type 1 training, develop the ATS and MTS for all KC-X systems, subsystems, and components, and upgrade other weapon system simulators to train refueling from the KC-X, without exception."

> Early on in the performance of this contract, we signed the Attachment (a) sublicense agreement and executed the Attachment (b) Non-Disclosure Agreement with Boeing to ensure we could use the Boeing aircraft data required to build the ATS devices. Unfortunately, the mismarking of Boeing data is further precluding us from obtaining the data necessary for the ATS.

> During the same Referenced PMR, you confirmed that Boeing should not be marking applicable OMIT data with proprietary markings as defined in the DFARS, and that you would address this with the KC-46 Program Office.  This mismarking of data continues to occur; therefore we respectfully request your assistance is [sic] resolving this issue so it does not further negatively affect the ATS delivery schedule.  Since FlightSafety does not have access to the delivered OMIT data items that are mismarked as proprietary or non-OMIT, we need your help in determining which data items have been mismarked.

165.    During the April 5 to 7, 2016 PMR, the Air Force confirmed Boeing should not be marking OMIT data with proprietary markings and that it would be addressed with the KC-46 Program Office.

166.    On October 7, 2016, for the first time, the Air Force's new cognizant contracting officer asserted the position that delivery of the Commercial Data Package and Military Data Package "is not the responsibility of the Government."

167.    Despite this Air Force position, on January 18, 2017, the parties executed Contract Modification 10 ("Mod. 10").

168.    Mod. 10 adjusted FlightSafety's delivery dates for the EMD training devices so that ATS deliveries were tied to the KC-46 aircraft delivery dates.  The estimated program slippage as of January 2017, was an additional six months.

169.    Mod. 10 reserved FlightSafety's right for an adjustment for the Commercial Data Package and Military Data Package delays and related cost impacts.

170.    From Contract award through January 18, 2017, despite the data delays, the Air Force failed to provide FlightSafety any schedule relief and, via the PCO, directed FlightSafety to meet contractual RFT deadlines.

171.    From March 2017 through August 31, 2017, FlightSafety, Boeing, and the Air Force implemented the ATS Tiger Team—a team of engineers and management personnel

from the Government, Boeing, and FlightSafety, and augmented periodically by Boeing vendor companies (e.g., Rockwell Collins and GE Aviation)—for the purpose of identifying and ensuring delivery of Commercial Data Package and Military Data Package information.

172.    This Tiger Team process produced portions of the missing data to FlightSafety.

173.    On May 31, 2017, despite the ATS device's operational baselines not yet having been completely developed in the ongoing EMD phase as a result of insufficient data, the Air Force exercised Production Option 2.

174.    On July 7, 2017, the Air Force issued another modification to the SGTO approach to amend its reliance on the KC-46 aircraft availability date provided by the Air Force.

175.    On July 31, 2017, the IMS submitted by FlightSafety implemented a continued data-driven program slip of approximately 5.5 months due to late and incomplete data.  Prior to submittal, on June 20, 2017, FlightSafety briefed this IMS to the Air Force.

176.    Throughout 2017, FlightSafety conducted initial delivery and installation of ATS devices, as directed by the Air Force through its exercising of production options and direction to provide "Red Item" capability, despite the ATS devices operational baselines not yet having been completely developed in the ongoing EMD phase as a result of insufficient data.

177.    After initial delivery and installation, throughout 2018 and 2019, FlightSafety continued to execute the Contract, as directed by the Air Force, with the limited data available, requiring continued root cause analysis and rework.

178.    On April 30, 2018, despite the ATS devices operational baselines not yet having been completely developed in the ongoing EMD phase as a result of insufficient data, the Air Force exercised Production Option 3.

179.    Boeing delivered the first KC-46 aircraft on January 25, 2019.

180.    The first KC-46 aircraft had significant deficiencies that will take years to remediate.

181.    On January 31, 2019, FlightSafety submitted a Request for Equitable Adjustment to the Air Force (the "REA").

182.    The REA asserts FlightSafety is entitled to a target cost and profit adjustment and firm, fixed-price adjustment of $33,788,259 and a contract schedule extension of 1,501 days, as of October 31, 2018, as a result of the Air Force's change to the Contract that caused an increase in the cost of, and the time required for, performance of the work under the Contract due to the late and incomplete data.

183.    On April 30, 2019, the Air Force denied in full the REA.

184.    On May 1, 2019, FlightSafety submitted to the Air Force the Certified Claim, which incorporated and attached the REA.

185.    On July 1, 2019, the Air Force, through the cognizant PCO, Ms. Melissa M. Koppenhoefer, issued a contracting officer's final decision denying in full the Certified Claim.

186.    On October 2, 2019, Boeing delivered the complete CDRL B027 to the Air Force. The Air Force is evaluating the Boeing delivered CDRL B027, which still may be incomplete.

187.    The Air Force also, consistent with prior practice, requested FlightSafety's assistance in evaluating the data Boeing delivered under its CDRL B027 for completeness.

188.    Completion of Increment 1 of EMD still has yet to occur.

**COUNT I:  GOVERNMENT CONSTRUCTIVELY CHANGED THE CONTRACT**

189.    FlightSafety alleges and incorporates each of the foregoing paragraphs of this Complaint as though fully set forth herein.

190.    Under the terms of the Contract, the Air Force must make an equitable adjustment to the Contract price, the delivery schedule, or both, and modify the Contract, when an Air Force

change to the Contract causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under the Contract.

191.    An order to proceed under unattainable requirements is a constructive change and a basis for price adjustment to the Contract, even when the unattainable requirement is ultimately relaxed to permit performance.

192.    The Air Force has been well aware that the KC-46 aircraft was severely behind schedule and has experienced numerous schedule delays.

193.    FlightSafety's development of the ATS under the Contract was, and remains dependent on, the timely development of the KC-46 aircraft by Boeing under the Boeing Contract with the Air Force.

194.    FlightSafety's development of the ATS under its Contract was, and remains dependent on, the timely availability of accurate and complete data packages for the KC-46 aircraft.

195.    The Air Force's failure to ensure timely availability of accurate and complete data for FlightSafety resulted in excusable delay to FlightSafety.

196.    On July 26, 2013, FlightSafety provided the Air Force PCO written notice of the constructive change to the Contract.

197.    Despite FlightSafety's repeated notices to the Air Force that the ATS program was facing unavoidable delays based on the delayed data, the Government required, until an agreement on January 18, 2017, that FlightSafety hold to the original Contract schedule.

198.    The failure of the Government to deliver timely or make available the accurate and complete data in compliance with the data quality requirements, based on actions of its other

prime contractor developing the KC-46 aircraft, while simultaneously directing FlightSafety to meet contract schedule was a compensable change to the Contract.

199.     The Air Force implementation of the "Red Item Capability" approach also was a compensable change.

200.     Had the Government proactively provided schedule relief once data availability issues began, FlightSafety would not have had to constructively accelerate its performance through the use of alternative, mitigating development actions, including the "Red Item Capability" approach.

201.     The Government's eventual issuance of Mod. 10, finally adjusting the contractual ATS delivery dates, further establishes that the Government's earlier insistence on continued compliance with the original schedule was a constructive change and constructive acceleration meriting an equitable adjustment.

202.     FlightSafety has incurred $33,788,259 of damages, as detailed in the REA and incorporated into the Certified Claim, based on the Air Force's constructive change and constructive acceleration of the Contract, including the performance of out of sequence work and re-work.  Since the submission of the REA and Certified Claim, impacts to FlightSafety have been continuing to accrue to an amount that will be proven in this case, based on the Air Force's constructive change and constructive acceleration to the Contract.

203.     The Air Force has breached the Contract by failing to equitably adjust the Contract.

204.     FlightSafety is entitled to a contract schedule extension and $33,788,259 of damages, as specified in the REA and incorporated into the Certified Claim, which have been continuing to accrue to an amount to be proven in this case.

## COUNT II:  GOVERNMENT BREACH OF CONTRACT

205.    FlightSafety alleges and incorporates each of the foregoing paragraphs of this Complaint as though fully set forth herein.

206.    Under the terms of the Contract, the Air Force committed to have FlightSafety obtain necessary data from the Air Force or Boeing.

207.    The Air Force was contractually required to ensure the timely availability of aircraft data from the aircraft OEM, Boeing, to the Air Force and to FlightSafety.

208.    The Air Force had full rights to the Commercial Data Package and Military Data Package.

209.    The Air Force is aware that the Commercial Data Package and Military Data Package are required to design, develop, and manufacture the aircrew training device.

210.    Throughout its performance on the Contract, FlightSafety has repeatedly notified the Air Force, by written notifications and PMR briefings, of late and incomplete data issues resulting in cost and schedule impacts.

211.    After FlightSafety entered into the Sublicense Agreement and ACA, and even a Nondisclosure Agreement, the Air Force's failure to ensure the timely flow of aircraft data to FlightSafety was a breach of its contractual obligations.

212.    As a result of this breach of contract, FlightSafety incurred $33,788,259 of damages, as specified in the REA and incorporated into the Certified Claim, which have been continuing to accrue to an amount to be proven in this case.

213.    FlightSafety is entitled to a contract schedule extension and $33,788,259 of damages, as specified in the REA and incorporated into the Certified Claim, which have been continuing to accrue to an amount to be proven in this case.

## COUNT III:  GOVERNMENT BREACH OF IMPLIED WARRANTY

214.    FlightSafety alleges and incorporates each of the foregoing paragraphs of this Complaint as though fully set forth herein.

215.    In awarding the Contract to FlightSafety, the Air Force warranted that the data necessary to perform the Contract would be timely made available to FlightSafety.

216.    The Air Force warranted that the aircraft OEM was required under its contract, the Boeing Contract, to deliver a flight simulator data package that conformed to the requirements of the IATA.

217.    The IATA requirements, the development of which Boeing participated in, identifies with clarity the scope and content of data required to build, test, and qualify flight simulation training devices of adequate fidelity to meet flight crew training requirements.

218.    The Air Force further stated that the aircraft OEM would be "required" to deliver "sufficient data to support [14 C.F.R.] Part 60 Level-D simulation and proof of match requirements" under CDRL B027 and SCR H007 of the aircraft OEM's contract.

219.    The Air Force later, on February 2, 2012, reiterated that the aircraft OEM "will deliver the initial data package to the Government" and that:

> The Government does not have the right under the License to disclose licensed materials to offerors, only to Simulator Manufacturers as defined in the License.  If the initial deliverables under B027 (Simulator Data Package) are delivered before award of the KC-46 ATS contract, they cannot be transferred until award of the KC-46 ATS contract. Boeing's support to Associate Contractors for other data is required by prime contract clause AFMCFARS 5352.217-9010: Associate Contractor Agreements. The Simulator Data Package has been provided at no cost to the KC-46 ATS prime Contractor.  However, potential vendors should be cognizant that it may be necessary for them to obtain information directly from aircraft subcontractors if proprietary data rights issues prevent Boeing from including such data.

220.    During the pre-solicitation and proposal process, the Air Force repeatedly asserted that either it would provide the technical data necessary to design and manufacture the aircrew training devices or that such data would be available for performance of the Contract without cost to the ATS prime contractor.

221.    Taken in their totality, these Government responses constitute a Government warranty that the Commercial Data Package and Military Data Package necessary for performance of the Contract would be made available to FlightSafety for FlightSafety to meet the Contract requirements, including the delivery schedule.

222.    This warranty is of particular importance as the data packages at issue were dependent on the Air Force's other prime contractor for the development of the KC-46 aircraft and were exclusively available from the Air Force or its aircraft OEM contractor and from no other source.

223.    FlightSafety relied on the Government's assurances that the accurate and complete data would be timely available for performance of the Contract.

224.    As reflected in FlightSafety's Proposal, which was accepted by the Government, the timely availability of the data necessary to design, develop, and manufacture the aircrew training devices—as warranted by the Government—was a fundamental presumption that formed the basis of the Proposal.

225.    The Air Force subsequently did not take effective steps to require the delivery of that data or make timely or complete efforts to separately deliver the data to FlightSafety for its use in developing the KC-46 ATS.  The complete Commercial Data Package and Military Data Package required for delivery of the Increment 1 devices has not been made available and is still not available.

226.    The Air Force also subsequently did not provide schedule relief to FlightSafety until Mod. 10 executed on January 18, 2017—after FlightSafety was required to take alternative, mitigating development actions to seek to perform to the initial Contract schedule.

227.    As a result of this breach of warranty, FlightSafety is entitled to a contract schedule extension and $33,788,259 of damages, as specified in the REA and incorporated into the Certified Claim, which have been continuing to accrue to an amount to be proven in this case.

### COUNT IV:  GOVERNMENT FAILURE TO DISCLOSE SUPERIOR KNOWLEDGE

228.    FlightSafety alleges and incorporates each of the foregoing paragraphs of this Complaint as though fully set forth herein.

229.    The KC-46 aircraft development contract was awarded on February 24, 2011 (more than two years before the Contract was awarded to FlightSafety).

230.    Based on information and belief, the Air Force knew at the time of the Contract award to FlightSafety of the gaps and omissions in the required aircraft data and the delayed status of the aircraft development contract.

231.    As the Government contracting party on the KC-46 aircraft development contract, the Air Force had a duty to know and understand both the quality and the reasonable availability of the aircraft data required for performance of the Contract and to timely disclose such knowledge to FlightSafety.

232.    Within the Government, both the KC-46 aircraft and ATS programs regularly are aware of the status of the other's contractual progress.

233.    The Government has an obligation to disclose factors of substantial influence on contract performance.

234.    FlightSafety, at the time it submitted the Proposal and award of the Contract, did not have vital knowledge about the status of the KC-46 development contract and the availability of data.

235.    The Air Force was aware that FlightSafety had no knowledge of, and had no reason to obtain, such information.

236.    In the solicitation and competition phase, the Air Force repeatedly provided assurances of the availability of the data for development of the ATS.

237.    The Contract timeframe and SCRs H001 and H006 misled FlightSafety and did not put it on notice to inquire on the status of the data and the ability to obtain the Commercial Data Package and Military Data Package from Boeing.

238.    The Air Force failed to disclose its superior knowledge to FlightSafety.

239.    The Air Force's failure to disclose superior knowledge resulted in $33,788,259 of damages, as detailed in the REA and incorporated into the Certified Claim, to FlightSafety, which have been continuing in nature.

## COUNT V:  COMMERCIAL IMPRACTICABILITY

240.    FlightSafety alleges and incorporates each of the foregoing paragraphs of this Complaint as though fully set forth herein.

241.    The lack of required data to perform a contract can make such a contract commercially impracticable.

242.    Performance of the Contract as awarded was commercially impracticable because the aircraft data required to design and develop the KC-46 aircrew training devices was not available.  Some required data is still not available for the completion of Increment 1.

243.    When the parties entered the Contract each expected the KC-46 aircraft development to proceed on schedule and for the Commercial Data Package and Military Data Package to be timely and compliantly delivered under the Boeing Contract.

244.    The KC-46 aircraft development did not proceed on schedule.

245.    The Commercial Data Package and Military Data Package were not timely and compliantly delivered under the Boeing Contract.

246.    FlightSafety did not bear the risk for either the KC-46 aircraft development not proceeding on schedule or for the Commercial Data Package and Military Data Package not being timely and compliantly delivered under the Boeing Contract.

247.    Lack of data availability and completeness caused FlightSafety delays under the Contract that more than doubled the period of performance and substantially increased FlightSafety's costs.

248.    When a contract is commercially impracticable to perform, a contractor is entitled to recover its cost of performance while attempting to satisfy the commercially impracticable performance requirement.

249.    The lack of required data for performance of the Contract rendered timely performance of the Contract commercially impracticable as awarded, and the Government is responsible for the cost impacts of the delay caused by the data unavailability.

250.    FlightSafety is entitled to a contract schedule extension and $33,788,259 of damages, as specified in the REA and incorporated into the Certified Claim, which have been continuing to accrue to an amount to be proven in this case.

## COUNT VI:  BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

251.    FlightSafety alleges and incorporates each of the foregoing paragraphs of this Complaint as though fully set forth herein.

252.    Every contract, including the Contract, includes an implied covenant of good faith and fair dealing.

253.    Important aspects of the covenant of good faith and fair dealing are the duties to cooperate and not hinder the other party's performance.

254.    The Air Force's duty not to hinder performance further requires the Government not to act so as to destroy FlightSafety's reasonable expectations regarding the fruits of the Contract.

255.    The Air Force is prohibited from doing anything to prevent performance by FlightSafety or that will hinder or delay FlightSafety in its performance.

256.    Not only must the Air Force refrain from hindering FlightSafety's performance, it must do whatever is reasonably necessary to enable FlightSafety to perform.

257.    Where the Air Force awards two contracts and one contract is dependent upon the successful performance of a prior contract, the Air Force cannot disavow its obligations to ensure that the prior contract is performed in a manner as to not impact the second contract.

258.    The Air Force had an obligation to conduct its administration of the Boeing Contract in a manner that would permit FlightSafety to perform the Contract.

259.    The Air Force had full rights to the Commercial Data Package and Military Data Package.

260.    The Air Force is aware that the Commercial Data Package and Military Data Package are required to design, develop, and manufacture the ATS.

261.    The Air Force breached the implied covenant of good faith and fair dealing by failing to enforce the terms of the Boeing Contract and by failing to ensure the availability of the Commercial Data Package and Military Data Package from Boeing, the Air Force's other prime

contractor and the prime contractor on which FlightSafety's ability to perform was predicated, or provide timely cost and schedule relief to FlightSafety based on the delinquent KC-46 program and corresponding necessary data.

262.     The Air Force's failure to ensure the availability of the data necessary to timely design, develop, and manufacture these training devices constituted a breach of its contractual obligations to coordinate the work and efforts under the Boeing Contract and the Contract.

263.     As a result of this breach of contract, FlightSafety is entitled to a contract schedule extension and $33,788,259 of damages, as specified in the REA and incorporated into the Certified Claim, which have been continuing to accrue to an amount to be proven in this case.

## IV.    **PRAYER FOR RELIEF**

WHEREFORE, FlightSafety respectfully requests that the Court enter judgment for Plaintiff in this Complaint and further requests the following relief:

A.     That the Court enter Judgment under Count I in favor of Plaintiff based on the Air Force's constructive change and constructive acceleration of the Contract, and require an Air Force payment to FlightSafety of $33,788,259 or the amount proven at trial and find the Plaintiff is entitled to a contract schedule extension;

B.     That, in the alternative, the Court enter Judgment under Count II in favor of Plaintiff based on the Air Force's breach of contract and require an Air Force payment to FlightSafety of $33,788,259 or the amount proven at trial and find the Plaintiff is entitled to a contract schedule extension;

C.     That, in the alternative, the Court enter Judgment under Count III in favor of Plaintiff based on the Air Force's breach of implied warranty and require an Air Force payment

to FlightSafety of $33,788,259 or the amount proven at trial and find the Plaintiff is entitled to a contract schedule extension;

D.      That, in the alternative, the Court enter Judgment under Count IV in favor of Plaintiff based on the Air Force's failure to disclose superior knowledge and require an Air Force payment to FlightSafety of $33,788,259 or the amount proven at trial and find the Plaintiff is entitled to a contract schedule extension;

E.      That, in the alternative, the Court enter Judgment under Count V in favor of Plaintiff based on the impossibility or commercial impracticability of the Contract and require an Air Force payment to FlightSafety of $33,788,259 or the amount proven at trial and find the Plaintiff is entitled to a contract schedule extension;

F.      That, in the alternative, the Court enter Judgment under Count VI for the Air Force's breach of the duty of good faith and fair dealing and require an Air Force payment to FlightSafety of $33,788,259 or the amount proven at trial and find the Plaintiff is entitled to a contract schedule extension;

G.      That the Court enter Judgment that FlightSafety is entitled to interest under the CDA from the date of May 1, 2019 until the date of the Government's payment of the damages; and

H.      That the Court award to FlightSafety such other relief as the Court deems proper.

Respectfully submitted this 28th day of January, 2020.

OF COUNSEL:

Phillip R. Seckman
K. Tyler Thomas
Dentons US LLP
1400 Wewatta Street, Suite 700
Denver, CO  80202
Telephone:  (303) 634-4000
Email:    phil.seckman@dentons.com
             tyler.thomas@dentons.com

113532144\V-9

*s/Mark J. Meagher*
Mark J. Meagher
Dentons US LLP
1400 Wewatta Street, Suite 700
Denver, CO  80202
Telephone:  (303) 634-4322
Facsimile:  (303) 634-4400
Email:  mark.meagher@dentons.com

ATTORNEYS FOR PLAINTIFF,
FLIGHTSAFETY SERVICES
CORPORATION